The next case for argument is 14-7131, Romero v. McDonald. I'll give everyone a chance to get settled here. Mr. Carpenter, whenever you're ready. May it please the Court, Kenneth Carpenter appearing on behalf of Paul Romero. There are two issues in this case. The first deals with this Court's rule of law created concerning deemed denied or implicitly denied claims. The position of the appellant is that the lower court and the board erred by relying upon this rule to dispose of the request for revision request. Is it your view that this rule, which you accept as a rule, just doesn't apply in TDIU context? To the contrary, Your Honor, it requires the filing of a request for revision, but that's all it does. All that the rule does is to say that if there is a question of there being a pending claim, then that rule, the implicit denial or deemed denied rule, comes into play. If it is found that there was an intervening decision that disposed of that claim, then it would be considered by rule to have been denied. If denied, it's a final decision and it's subject to revision. There is no connection after that in the consideration of whether or not there was or was not a clear and unmistakable error in that final decision. To the contrary, this Court's decision in Roberson controls the disposition when there is an issue that was not fully developed to its optimum before the claim was decided on its merits. And as a result of that, this Court said in Roberson that that would be a clear and unmistakable error, that there would be a final decision based upon the pre-articulation of the implicit denial rule, that the issue was there, but it was not adjudicated. But the Court said in Roberson that is not a pending claim. The decision that was made was a final decision and that decision is subject to revision based upon the rule established in Hodge. The rule established in Hodge is that the VA has a duty to fully and sympathetically develop a claim to its optimum before deciding it on the merits. The claim in this case is a claim for increased compensation. The VA granted scheduler increase to 70 for a portion and from August 2002 forward a 100% scheduler rating. For some 13 months prior to August of 2002, the remaining issue was entitlement to extra scheduler. In this case, the Board and the Veterans Court acknowledged that an implied claim for an extra scheduler total rating or TDIU was raised by the evidence. That was not adjudicated. When it was not adjudicated under this Court's rule in Roberson, that was a clear and unmistakable error. What do you mean it was not adjudicated? What do you mean? I mean, because they didn't spend pages talking about it? I mean, how do we… It was never referenced, Your Honor, that the existence of entitlement to an extra scheduler total rating under 4.16a, which is required when you meet the scheduler requirements, in this case of 70% for a service-connected disability, triggered consideration of that on an extra scheduler. In the Board's opinion, they expressly say it was adjudicated. The Board expressly made a fact finding that it was in fact adjudicated. What do we do about that? I don't get you. That's contrary. Well, there was a final decision. Under Roberson, it was not an adjudication. It was a clear and unmistakable error because Roberson says if you don't decide the issue, the Board cannot make a legal determination that there was an adjudication when in fact there is nothing in the record… Whether it was decided by the lower… I believe in the context that this Court's holding in Roberson, dealing with extra scheduler consideration, that is a question of law. You're telling me whether a body did or did not decide a given issue is a question of law? Yes. And if it's a question of fact, then you admit that… That I lose. Can I just be clear on what we're talking about here? Yes. It's not intuitively obvious to me that there's a distinction between a decision and an adjudication. Correct. But is it your view that, yeah, there was a decision here. They decided no, but they didn't adjudicate it. They decided it without adjudicating it. Can you explain to me what that means? What that means is that there were two issues that needed to be decided. Entitlement to the scheduler rating, which they decided should be increased to 70%. Right. The next issue was whether there was entitlement based upon that increase to an extra scheduler rating. And they decided that issue. They did not decide that issue. I thought you said they decided it but didn't adjudicate it. Well, as Judge Moore points out, the board found that it had been adjudicated. But it had been adjudicated under the board's analysis based upon the implied or deemed denied rule. That deemed denied rule cannot create an adjudication where there was no adjudication. That's the error of law here. And in your view… I'm sorry? In your view, what would that original decision have to say in order to satisfy Roverson? In order to satisfy Roverson, it would have to acknowledge the existence that once the veteran met the scheduler requirement under the regulation, that he was entitled to extra scheduler consideration and make a specific determination that he was able or unable to follow substantial gainful occupation as a result of his service-connected disability. And they did not do that. There is no reference in that decision in 2002 that discusses 4.16, discusses extra scheduler, or even acknowledges the fact that as a result of the increased scheduler rating, the provisions of 4.16 apply. If I could shift to the question of interpretation of 4.16, which we also allege is error in this case. We believe that the Veterans Court, by affirming the Board's decision, relied upon the Board's misinterpretation of 4.16, specifically that because the veteran, in the words of the Board, was in fact working, that the mere fact of working was excluded consideration of his inability to secure or follow gainful occupation as a result of his service-connected disability. That's at direct odds with the plain language of the regulation. 4.16a provides that a veteran may work and may in fact have what is called marginal employment under the regulation. Marginal employment is defined as income that does not exceed the poverty line. Yeah, but the sentence in which you point out on J58, I think that's what you're referring to, where they use the, they reference the fact that he was in fact working, is preceded by a direct quote from the regulation. So they obviously knew that was the standard, right? But that's the point, Your Honor. That is not the standard. Well, no, I'm talking about the standard where they say, they quote the standard as being unable to secure and follow substantial gainful occupation, blah, blah, blah. That's the standard in the reg. Well, that's part of the standard in the reg. But the reg defines the ability to work as being included in the inability to secure or follow substantial gainful occupation. The disconnect here is that in the VA's own regulation, it says that a veteran may in fact be able to work and have income so long as that income from that work does not exceed the poverty level. But your interpretation of the regulation seems to me is almost beside the point because they found that there was no evidence from 2002 regarding whether or not he was gainfully employed. I mean, your argument is what it means to be gainfully employed. And even if I agree with everything you're saying there, I don't see how it results in your client prevailing because what they said in 2000, there was no evidence in 2002 about his income from those pieces of employment he had. And once there was evidence from that point forward, he was 100 percent totally disabled. Once there was evidence, not of the 2002 quantity of employment, but of the Dr. Moat thing. The analysis required under 4.16, in this case in the 13-month window from July 2001 to August of 2002, is to determine whether or not he had more than marginal income. Your Honor is absolutely correct. The only evidence of record was that he had some problems in his job, but what wasn't introduced into record was anything regarding the amount of money he was making to assess whether he was gainfully employed. That's precisely the point, Your Honor. But your problem is, your argument really is the VA should have assisted him. They should have recognized this deficiency in the record evidence, and they should have sought it out or prompted him to seek it out. Well, that's duty to assist, and there's a statute that says duty to assist can never be cued. We've got an in-bank case that says the same thing. Don't agree with it. Wish it wasn't there. Like to go back and undo it. Can't. Bound by all of it. So I don't see how your argument is very circular, but I don't see how it prevails in light of the duty to assist. It is circular, Your Honor, because it is predicated upon the standard in Roberson. The standard in Roberson is based upon the standard adopted by this Court in Hodge, that Congress imposed upon the VA the duty to fully develop. That's the same thing. They're not indistinguishable. The duty to assist. You've got to fully develop this. Or are you talking about to analyze it in decision? I'm talking about the holding in Roberson, which adopts the rule in Hodge, that says that constitutes a clear and unmistakable error, and it is that precise failure to fully develop. What do you mean fully develop? I don't understand. To go get that evidence of what his income was. That's the duty to assist. And there's a statute and a case of ours that says that can't ever amount to Q. As an allegation of Q. And this Court addressed that in Roberson, and it said that when the VA fails to decide an issue, that that issue, the failure to decide it, is a clear and unmistakable error. And you don't have to get into the duty to assist. But the Board found they decided it here. The Board expressly found it was deemed denied. And they misused the deemed denied because deemed denied has nothing to do with the disposition of a request for revision. It only forces the veteran to make that request for revision. See that I'm into my rebuttal time. I'm here for the government. Thank you. Thank you, Your Honor. May it please the Court. I'd like to first address Mr. Romero's argument that the use of the implicit denial rule is incompatible with the VA's duty to fully develop a claim. As an initial matter, the Court has already addressed the question of whether an informally raised claim can be subject to the implicit denial rule in its decisions in Deschotel and Adams. And there's really no distinction with the TDIU claim. In fact, in the Court's decision in Deschotel, it referenced its 2005 decision in Andrews and in Roberson, where it stated that it was, in fact, following the same principle, that once a decision is rendered, if a claimant believes a decision has not been expressly made on one claim, and here it would be TDIU, which was at issue in Andrews, that the proper course is to either directly appeal that or to raise a Q challenge. One thing also I would note is that here, while the Board used the language of implicit denial, the panel has correctly noted that the 2002 RO decision did address TDIU, because while Mr. Romero was granted an increase of 70% for one period, the period of July 2001 through August 2002, the same decision found that Mr. Romero was entitled to a TDIU rating of 100% effective August 15, 2002 forward. Can I just ask you about the second point, the second issue we were talking about, about how you determine whether or not somebody is eligible. The JA58 statement that says the veteran, and it quotes the parts of 4.16, and then says, because he was, in fact, working. That's not right, is it? Well, Your Honor, I think that the important thing here is to put this in the context. Why don't you ask them a question? They can explain it. That's not correct, is it? It's not correct that that is the standard by which you judge TDIU. However, I don't believe that the Board or the Veterans Court thought that it was creating a rule of law under which a TDIU rating would be, per se, not applicable if there was any evidence at all of employment. Instead, it's important to put this in the context. No, but at a minimum, they're deciding this case, and they're looking at the evidence in this case, and they're saying he doesn't qualify because he was, in fact, working. But that's not right, is it? It is right in the context of Q, which is the context in which this case arose. Of course, in Q, it's a collateral attack, and there are very specific requirements for showing Q. First of all, it has to be based on the evidence in the record, and you have to show that there is an error that's outcome determinative. Here, Mr. Romero is stating that he believes he should have been awarded TDIU for a certain period. However, there was evidence in the record that he was employed during that period. And so, in terms of Q, he cannot establish that it was an undebatable error that the RO failed to guarantee him TDIU for that period. If there's evidence that somebody's working, that I've worked at a minimum-wage job for three hours a week, so you're saying there can never be a Q because they can say, well, in fact, there was some evidence that she worked three hours a day and made minimum wage, then it can't be clear an unmistakable error, if, in fact, that doesn't even come close to meeting the substantially gainful employment standard and the rest? It would depend on the evidence of the record. And here, there isn't evidence that Mr. Romero was below the poverty threshold in the record that was before the RO. The problem that I'm having is that they didn't say that. The only thing they referenced, and it's preceded by the word because, which means it sort of posits that thing, because he was, in fact, working. They don't describe what it was about the working. So, do you think that's really okay? On Q, absolutely. Because the question is whether the RO unbeatably erred on that record in determining that Mr. Romero had established a rating of 70%, which, again, a 70% rating recognizes, and it's intended to under 38 U.S.C. 1155, that there are ways in which the disability is affecting the occupational earnings. So, there's a 70% rating for that period, and there was evidence that Mr. Romero was working. Now, Mr. Romero knew that his income was not very great, but if he believed when he got that rating decision, showing that 70% rating period for one portion of the time and 100% going forward in August 2002, his options then were to file a direct appeal, or if he failed to do that, as he did, to raise a Q challenge. But once he failed to direct appeal, where he could have made arguments about the weight of the evidence or an argument about the marginal employment, having failed to file a direct appeal, however, he is in this very narrow context of Q, which recognizes that it is an exception to the important rule of finality and, therefore, has very stringent requirements and must be on the evidence in the record. And for TDIU, which is a recognition that a veteran is unable to work above marginal employment, evidence in the record does... Your argument, I think, taking a long time to get to what I'll say in the summary, I think is, while it may have been an error when they said that he was employed, his route was to directly appeal it, but once you're at Q, you have to show not only that maybe there's some error in the language used by the decision maker, but that the outcome is positive, clearly and unmistakably. And this record doesn't establish that. That's right. And going back to Mr. Romero's first argument, he sort of weaves these arguments together, where he's trying to conflate the rule of law in Roberson with the duty to assist. If we look at what Mr. Romero is really arguing here, he's stating that anytime a veteran can point to a final decision and say, I think there's enough in the record to show that I established an informal claim for TDIU, but there's no express reference to TDIU in the decision, that not only would the veteran then establish Q, but would be eligible to a TDIU rating. But that completely ignores the second half of the Q standard, which requires an outcome determinative error, and promotes a standard under which there would be a- And the argument would be, we don't know what the outcome determinative is, because for better or worse, the record at that time doesn't contain information along the lines of, he was only working at VAR for three hours a week. It doesn't contain information upon which any reasonable person would know he was not gainfully employed. Yes, but more than that, Mr. Romero is arguing that the VA shouldn't be able to look at the evidence at the point that he's arguing that there's a Roberson error. He's saying that as long as he can establish that there's not an express statement relating to TDIU in a decision, that the veteran would be entitled to TDIU, regardless of whatever evidence was in the record. And again, here, of course, this argument is particularly not well made, because the RO's decision does, in fact, address TDIU, because it was awarded for a part of the period that was under consideration. If the court has no further questions, please. Your Honors, we need to correct the record here, notwithstanding what the government just said. The 2002 decision did not address TDIU. What the 2002 decision did when it addressed a scheduler rating of 100 percent, it was operating under a completely different set of regulations. Scheduler ratings for psychiatric disabilities are controlled by 38 CFR 4.130. Extra scheduler ratings, which is TDIU, are controlled by 4.16A. When you grant a scheduler rating, as they did in this case in 2002, they're using the VA's schedule of ratings for disabilities, in this case a psychiatric disability, and they assigned a 100 percent disability rating going forward from August of 2002. The government is absolutely incorrect when it states to this court that TDIU was decided in 2002. It was not. It was never mentioned. Review the record. There is no reference to 4.16A, an inability to work, or TDIU in the 2002 decision. Wait, wait, wait. I'm on the 2002 decision page, JA30. As there is a question as to your inability to work being permanent, your PTSD disorder is subject to review no sooner than five years, the 100 percent is for total occupational and social impairment. They expressly say inability to work. They expressly say total occupational impairment. Why should I not consider that as a decision on your employability? Because that's the scheduler criteria under 4.130. In order to get a 100 percent rating, you have to have a total social and industrial impairment. That's the scheduler requirements to assign a 100 percent scheduler rating. That cannot be confused with the extra scheduler total rating, which provides for an inability to work specifically, without regards to social considerations, due to the service-connected disability, which is available by separate regulation under 4.16A. Those are completely different, Your Honor. And for the government to suggest otherwise is simply incorrect and disingenuous before this court. The other consideration is that the government comes before this court and offers a post hoc rationalization for what the board might have done relative to a Q analysis. There is no determination at page 59 that the conclusion about in fact working had to do with the Q analysis, with the analysis of outcome determinative or a manifestly different outcome. That is simply not what took place. All that took place was is they cited the regulation and then they said, he didn't demonstrate it because he was in fact working. As Judge Prost correctly confronted the government with, that is not the legal standard. You can in fact work and be entitled to an extra scheduler rating under 4.16. Thank you very much, Your Honor. Thank you. We thank both counsel and the case reviewers.